IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

---

**STATE OF ARIZONA,**
*Appellant,*

*v.*

**ROBIN PEOPLES,**
*Appellee.*

---

No. CR-15-0301-PR
Filed September 12, 2016

---

Appeal from the Superior Court in Pima County
The Honorable Teresa Godoy, Judge *Pro Tempore*
No. CR20142935-001
**AFFIRMED**

Memorandum Decision of the Court of Appeals, Division Two
2 CA-CR 2014-0408
Filed July 30, 2015
**REVERSED**

---

COUNSEL:

Barbara LaWall, Pima County Attorney, Nicolette Kneup (argued), Deputy County Attorney, Tucson, Attorneys for State of Arizona

Steven R. Sonenberg, Pima County Public Defender, Michael J. Miller, David J. Euchner (argued), Deputy Public Defenders, Tucson, Attorneys for Robin Peoples

---

JUSTICE TIMMER authored the opinion of the Court, in which CHIEF JUSTICE BALES, VICE CHIEF JUSTICE PELANDER, and JUSTICES BRUTINEL and BOLICK joined.

JUSTICE TIMMER, opinion of the Court:

¶1         The issue in this case is whether an overnight guest who left his cell phone in his host's apartment lost his legitimate expectation of privacy in that phone, thereby defeating his challenge to a warrantless search of the phone. We hold that the defendant here did not lose his expectation of privacy in his phone. And as an overnight guest, he had a legitimate expectation of privacy in the apartment. Because no exception to the warrant requirement existed, and the good-faith exception to the exclusionary rule did not apply, the trial court properly suppressed evidence of a video found on the phone and of statements the defendant made to the police about that video.

## I.  BACKGROUND

¶2         Robin Peoples lived next door to his girlfriend, D.C., at a Tucson apartment complex. He frequently spent time at D.C.'s studio apartment. About three months into the relationship, Peoples spent the night at D.C.'s apartment and used his cell phone to film the couple having sex. D.C.'s daughter, who also lived at the complex, found D.C. unresponsive in bed the next morning while Peoples was in the bathroom. The daughter called 911, and Peoples ran from the apartment to direct the paramedics, leaving his cell phone behind. While paramedics were tending to D.C., whom they ultimately pronounced dead, Peoples sought solace at a friend's upstairs apartment. No one asked Peoples to leave D.C.'s apartment.

¶3         Tucson Police Officer Travis Mott came to D.C.'s apartment after she was pronounced dead. He looked for information that might identify D.C.'s doctor, hoping the doctor could shed light on D.C.'s recent health and sign the death certificate. He found a "smart" cell phone in the bathroom. Assuming the phone belonged to D.C., the officer turned it on and opened it with a finger swipe to search her contacts (it was not passcode protected). A paused video-image of D.C. on her back in bed, mostly naked, appeared on the screen. The officer pressed "play" and watched part of a video of Peoples having sex with a seemingly unresponsive D.C. Before he watched the video, Officer Mott had been told that Peoples spent the night at the apartment.

¶4         Peoples returned to D.C.'s apartment a short time after leaving and asked a police officer at the door to retrieve his cell phone from the bathroom. According to Peoples, that officer entered the apartment and

later returned, handcuffed Peoples, and took him into Peoples' apartment. Officer Mott testified he was never told about Peoples' request. According to Officer Mott, after viewing the video, he detained Peoples in his apartment, read him his *Miranda* rights, and questioned him about the video. Peoples confirmed that he had sex with D.C. during the early morning hours and filmed it with his phone. Peoples also told Officer Mott that D.C. "probably was [dead]" when they had sex, although he "thought she was breathing" and had heard "her snoring earlier." Peoples later watched the video with other officers and answered their questions.

¶5        The State charged Peoples with necrophilia and two counts of sexual assault. Peoples moved to suppress evidence of the video, contending that the warrantless search of the phone was unlawful under the federal and state constitutions. After an evidentiary hearing at which Officer Mott, Peoples, and a detective testified, the trial court granted the motion. It also suppressed Peoples' statements to police because they resulted from the illegal search. The court of appeals reversed, reasoning that the warrantless search was permissible because Peoples did not have a reasonable expectation of privacy in either D.C.'s apartment or his cell phone and therefore could not challenge the searches. *State v. Peoples*, 2 CA-CR 2014-0408, at *5–6 ¶¶ 22, 27–28 (Ariz. App. July 30, 2015) (mem. decision).

¶6        We granted review because the constitutional issues raised are of statewide importance. We have jurisdiction pursuant to article 6, section 5(3), of the Arizona Constitution and A.R.S. § 12–120.24.

## II. DISCUSSION

¶7        We review the grant of a motion to suppress for an abuse of discretion. *State v. Valenzuela*, 239 Ariz. 299, 302 ¶ 9, 371 P.3d 627, 630 (2016). An error of law, however, constitutes an abuse of discretion. *State v. Cheatham*, 240 Ariz. 1, 2 ¶ 6, 375 P.3d 66, 67 (2016). In reviewing the ruling, we consider only the evidence introduced at the suppression hearing and view that evidence in the light most favorable to upholding the trial court's ruling. *Valenzuela*, 239 Ariz. at 301 ¶ 3, 371 P.3d at 629.

¶8        The Fourth Amendment to the United States Constitution and article 2, section 8, of the Arizona Constitution protect against unlawful searches and seizures. *State v. Wilson*, 237 Ariz. 296, 298 ¶ 7, 350 P.3d 800,

802 (2015). These rights are personal and can be invoked only by a defendant with a "legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143 (1978). Our courts have sometimes referred to this requirement as "standing" for the sake of brevity. *See, e.g., State v. Martinez*, 221 Ariz. 383, 389 ¶ 21 n.7, 212 P.3d 75, 81 n.7 (App. 2009); *State v. Juarez*, 203 Ariz. 441, 445 ¶ 16, 55 P.3d 784, 788 (App. 2002). But courts must decide whether a defendant possessed a legitimate expectation of privacy applying Fourth Amendment principles rather than traditional standing principles. *See Rakas*, 439 U.S. at 139–40; *see also Minnesota v. Carter*, 525 U.S. 83, 87 (1998) (emphasizing that *Rakas* "expressly rejected" use of "'standing' doctrine" to decide whether a defendant had a legitimate expectation of privacy). A defendant's subjective expectation of privacy is "legitimate" if it is "one that society is prepared to recognize as reasonable." *Minnesota v. Olson*, 495 U.S. 91, 95–96 (1990) (quoting *Rakas*, 439 U.S. at 143 n.12) (internal quotation marks omitted).

¶9 A warrantless search is per se unreasonable under the Fourth Amendment and article 2, section 8, unless an exception to the warrant requirement applies. *See Valenzuela*, 239 Ariz. at 302 ¶ 10, 371 P.3d at 630 (citing *Arizona v. Gant*, 556 U.S. 332, 338 (2009)). The court must exclude from a criminal trial any evidence obtained in violation of the Fourth Amendment and article 2, section 8, unless the good-faith exception to the exclusionary rule applies. *See Davis v. United States*, 564 U.S. 229, 236–39 (2011); *see also State v. Guillen*, 223 Ariz. 314, 317 ¶ 13 n.1, 223 P.3d 658, 661 n.1 (2010) (stating that for purposes of the Arizona Constitution, "the exclusionary rule to be applied as a matter of state law is no broader than the federal rule") (citation and internal quotation marks omitted).

¶10 The primary issue here is whether Peoples had a legitimate expectation of privacy in his cell phone or in D.C.'s apartment as an overnight guest at the time of the search. If he did, the State concedes that no exception to the warrant requirement applies to permit the search. In that event, we must consider whether the good-faith exception to the exclusionary rule nevertheless permits introduction of the evidence the trial court suppressed.

## A. Legitimate expectation of privacy

### 1. Cell phone

¶11        The trial court relied on *Riley v. California*, 134 S. Ct. 2473 (2014), to find that Peoples had a legitimate expectation of privacy in his cell phone.  In *Riley*, the Supreme Court held that the search-incident-to-arrest exception to the warrant requirement does not permit cell phone searches because the rationale for that exception does not apply to cell phones.  *Id.* at 2485–91.  Significantly, the Court recognized a uniquely broad expectation of privacy in cell phones because they essentially serve as their owners' digital alter egos.  It reasoned that modern cell phones are unlike other objects found within an arrestee's control, being "minicomputers" that contain "a digital record of nearly every aspect of [people's] lives–from the mundane to the intimate."  *Id.* at 2489–90.  "The fact that technology now allows an individual to carry such information in his hand does not make the information any less worthy of the protection for which the Founders fought."  *Id*. at 2495.

¶12        Mindful of its general preference to clearly guide law enforcement by constructing categorical rules that avoid application "in an ad hoc, case-by-case fashion by individual police officers," the Court held that an officer must generally obtain a warrant before searching cell phone data.  *Id.* at 2491–93 (citation and internal quotation marks omitted).  Warrantless searches are prohibited unless "case-specific exceptions . . . justify a warrantless search of a particular phone," such as "the need to prevent the imminent destruction of evidence in individual cases, to pursue a fleeing suspect, and to assist persons who are seriously injured or are threatened with imminent injury."  *Id.* at 2494.

¶13        The court of appeals found *Riley* inapplicable because Peoples did not have the cell phone within his immediate control when Officer Mott found and searched it.  *Peoples*, 2 CA-CR 2014-0408, at *5 ¶¶ 26–27.  But *Riley* did not hold that individuals have privacy interests in their cell phones only when in their physical possession.  The Court instead held that the search-incident-to-arrest exception to the warrant requirement does not apply to permit searches of cell phones.  *Riley*, 134 S. Ct. at 2493 ("Our holding, of course, is not that the information on a cell phone is immune from search; it is instead that a warrant is generally required before such a search, even when a cell phone is seized incident to arrest.").  And the court of appeals' limitation is at odds with the Supreme Court's reasoning that cell phones contain "the privacies of life" and are therefore worthy of Fourth Amendment protection.  *See id.* at 2494–95.  That privacy is no less worthy

of protection when a cell phone is outside a person's immediate control. *Cf. State v. Ontiveros-Loya*, 237 Ariz. 472, 477 ¶ 16, 352 P.3d 941, 946 (App. 2015) (concluding that arrestee had privacy expectation in cell phone data even though the phone was out of reach).

**¶14** The court of appeals also incorrectly suggested that Peoples lost his privacy interest in the cell phone by "[leaving] D.C.'s apartment while numerous other individuals were present, including police officers, leaving his cellular telephone behind, in the bathroom." *Peoples*, 2 CA-CR 2014-0408, at *6 ¶ 27; *cf. State v. Walker*, 119 Ariz. 121, 126, 579 P.2d 1091, 1096 (1978) (acknowledging that a person retains no reasonable expectation of privacy in property that is voluntarily abandoned). Peoples left his cell phone behind when he ran from the apartment to direct paramedics; only D.C. and her daughter were in the apartment. And when he returned a short time later, he asked the officer at the door to retrieve the phone. In oral argument before this Court, the State acknowledged that Peoples did not abandon his cell phone, and we agree.

**¶15** The State further argues that Peoples did not have a reasonable expectation of privacy in his cell phone because no passcode was required to activate it. But personal belongings need not be locked for a legitimate expectation of privacy to exist. *Cf. United States v. Davis*, 332 F.3d 1163, 1167–68 (9th Cir. 2003) (stating that person had reasonable expectation of privacy in closed gym bag, even though bag could be unzipped); *State v. LaPonsie*, 136 Ariz. 73, 75, 664 P.2d 223, 225 (App. 1982) (leaving door to home "wide open" does not lower expectation of privacy to the point of extending an invitation for others to enter). Cell phones are intrinsically private, and the failure to password protect access to them is not an invitation for others to snoop.

**¶16** We conclude, as did the trial court, that Peoples had a legitimate expectation of privacy in his cell phone when Officer Mott conducted the search.

### 2. Overnight guest status

**¶17** Peoples also argues that he had a legitimate expectation of privacy in D.C.'s apartment as an overnight guest. We do not have to address this argument in light of our resolution of the cell phone dispute. But people frequently stay the night with friends, and the question of when

overnight guest status ends is likely to reemerge. We therefore resolve the issue to guide law enforcement officers and courts.

¶18 An overnight guest has a legitimate expectation of privacy in the host's home. *See Olson*, 495 U.S. at 96–97 ("Olson's status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable."); *State v. Davolt*, 207 Ariz. 191, 202 ¶ 24, 84 P.3d 456, 467 (2004) ("Article 2, section 8 of the Arizona Constitution, as well, protects the right to privacy in temporary residences."). By its nature, overnight guest status is temporary. *Cf. Olson*, 495 U.S. at 99 (characterizing overnight guest accommodations as "a temporarily private place whose momentary occupants' expectations of freedom from intrusion are recognized as reasonable") (citation and internal quotation marks omitted). There is no dispute that Peoples was D.C.'s overnight guest when she died. The issue here is whether that status ended before Officer Mott conducted his search.

¶19 There is no uniform time when overnight guest status ends. To make this determination, a court must examine the totality of the circumstances, as it does when deciding whether a defendant was ever an overnight guest in the host's home. *See United States v. Armenta*, 69 F.3d 304, 308 (9th Cir. 1995). The key consideration is whether the defendant's continued expectation of privacy in the host's home was reasonable. *Cf. Olson*, 495 U.S. at 95–96 ("A subjective expectation of privacy is legitimate if it is one that society is prepared to recognize as reasonable.") (quoting *Rakas*, 439 U.S. at 143 n.12) (internal quotation marks omitted).

¶20 The court of appeals found that "[Peoples'] voluntary departure from D.C.'s apartment signaled the end of his visit and any corresponding expectation of privacy." *Peoples*, 2 CA-CR 2014-0408, at *4 ¶ 19. It distinguished *Olson*, in which the defendant temporarily left his host's house and nothing suggested his guest status had ended before he returned to hide from police. *Id.* ¶ 20. By contrast, the court reasoned, Peoples voluntarily left D.C.'s apartment, did not reenter it, and did not leave sufficient personal belongings behind to suggest that his overnight guest status would continue. *Id.* ¶ 21. The court also noted that because Peoples lived next door, he had no need for temporary shelter and privacy, a reason underlying the overnight guest principle. *Id.* And because D.C. died, Peoples could not have reasonably expected to again be an overnight guest in her apartment. *Id.*

¶21     We disagree with the court of appeals because the totality of circumstances, viewed in the light most favorable to upholding the trial court's ruling, supports the trial court's implicit finding that Peoples had not concluded his stay when Officer Mott conducted the search.  Nothing suggests that D.C. had asked Peoples to leave the apartment before she died.  And although Peoples voluntarily left the apartment, he did so to quickly usher paramedics to D.C.'s side.  Even though he did not immediately reenter the apartment, he acted sensibly by not doing so.  Paramedics had to attend to D.C. in a small studio apartment.  Indeed, as soon as they arrived, D.C.'s daughter left the apartment.  Rather than stand outside the apartment, Peoples, understandably upset, went upstairs for a short time to seek consolation from a friend.  Upon his return, he asked the officer at the door to retrieve the cell phone and Peoples remained outside because, as he explained, "I didn't want to see her like that because I've never seen anybody dead."

¶22     In these circumstances, the trial court reasonably concluded that Peoples did not terminate his guest status when he left D.C.'s apartment but instead maintained a reasonable expectation of privacy in the apartment until he was able to conclude his stay by retrieving his phone.  It was not necessary, as the court of appeals suggested, that Peoples expect to continue his guest status beyond the point at which he could gather his belongings.  His expectation of maintaining this status until that point was in accord with social custom and reasonable.  *See Olson*, 495 U.S. at 95–96; *see also Granados v. State*, 85 S.W.3d 217, 226 (Tex. Crim. App. 2002) (stating that even when a guest has been asked to leave by the host, the guest's reasonable expectation of privacy in the home remains until that person has had a reasonable opportunity to gather his effects).

¶23     Nor did Peoples terminate his guest status by not leaving more possessions behind in D.C.'s apartment.  Peoples lived next door and had no need to bring toiletries, clothes, and the like for his stay.  That did not preclude his overnight guest status or prevent him from continuing that status until he could retrieve his phone.

¶24     The State argues that after Peoples left D.C.'s apartment his guest status ended because his host had died.  But even if D.C. lost her expectation of privacy upon her death, that fact would not preclude Peoples from continuing to have a legitimate expectation of privacy.  Overnight guest status depends on the legitimacy of the guest's expectation of privacy

under the totality of the circumstances, not the owner's expectation of privacy after death. *Cf. Olson*, 495 U.S. at 98 ("[S]ociety recognizes that a houseguest has a legitimate expectation of privacy in his host's home."). Indeed, overnight guest status is not dependent on the host's presence in the home. *Cf. United States v. Pollard,* 215 F.3d 643, 647–48 (6th Cir. 2000) (concluding that the defendant had reasonable expectation of privacy in his friend's home in light of circumstances that included the friend's permission for him to spend the night in his absence). It follows that guest status validly extended by a host does not terminate the moment the host dies.

¶25 The trial court did not err in concluding that Peoples was an overnight guest and had a reasonable expectation of privacy in D.C.'s apartment when Officer Mott conducted the search. For this additional reason, Peoples was entitled to challenge the search of his cell phone under the federal and state constitutions.

## B. Good-faith exception

¶26 The State argues that the good-faith exception to the exclusionary rule applies and asks us to overturn the trial court's ruling on that basis. The exclusionary rule, which authorizes a court to suppress evidence gathered in violation of the Fourth Amendment, is a prudential doctrine used to discourage future violations. *Davis*, 564 U.S. at 23–37. But "when [law enforcement officers] act with an objectively 'reasonable good-faith belief' that their conduct is lawful," deterrence is unnecessary and the exclusionary rule does not apply. *Id.* at 238 (quoting *United States v. Leon*, 468 U.S. 897, 909 (1984)).

¶27 Although the State raised the good-faith exception at the suppression hearing, the trial court did not address the exception in its ruling. Nevertheless, the court did not err by implicitly finding that the good-faith exception did not apply.

¶28 The evidence supports a finding that Officer Mott did not have a good-faith belief that the cell phone belonged to D.C. When the officer opened the phone he saw a paused video depicting D.C. naked and seemingly unresponsive in bed, which indicated that someone other than D.C. had shot the video. Although it was possible that another person had used D.C.'s phone, because Officer Mott knew that Peoples had spent the

9

night, he did not have an objective, good-faith belief that the phone in the bathroom belonged to D.C. It would have been a simple matter for the officer to have asked Peoples if the phone belonged to him. Officer Mott apparently knew that Peoples was nearby as after reviewing the video, the officer "went over and talked to him." *Cf. Illinois v. Rodriguez*, 497 U.S. 177, 185 (1990) ("It is apparent that in order to satisfy the 'reasonableness' requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by . . . the police officer conducting a search . . . is not that [the officer] always be correct, but that [the officer] always be reasonable.").

¶29 The evidence also supports a conclusion that Officer Mott knew or reasonably should have known that Peoples was an overnight guest with a reasonable expectation of privacy in D.C.'s apartment at the time of the search. Officer Mott testified that before conducting his search, he had been told by other officers that Peoples spent the night as D.C.'s guest. Yet the officer did not try to find Peoples either to determine whether he had concluded his stay or to permit him to do so by removing his belongings. It would have been easy for the officer to have simply asked Peoples whether he had removed his possessions. If not, the officer could have asked Peoples to consent to a search for information identifying D.C.'s doctor.

¶30 Based on this evidence, the trial court did not abuse its discretion by implicitly finding that the good-faith exception to the exclusionary rule did not apply.

## CONCLUSION

¶31 We reverse the court of appeals' memorandum decision and affirm the trial court's suppression order.