NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

WILLIAM ESPY, *Appellant.*

No. 1 CA-CR 17-0530
FILED 10-11-2018

Appeal from the Superior Court in Maricopa County
No.  CR2016-122639-001
The Honorable Lauren R. Guyton, Judge *Pro Tempore*

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Eric Knobloch
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Mark E. Dwyer
*Counsel for Appellant*

<hr />

**MEMORANDUM DECISION**

Presiding Judge Jennifer B. Campbell delivered the decision of the Court, in which Judge Maria Elena Cruz and Judge Diane M. Johnsen joined.

<hr />

**C A M P B E L L**, Judge:

¶1        William Espy appeals his conviction and sentence for possession of marijuana for sale. Espy argues (1) the court's admission of statements he made during a settlement conference for impeachment purposes was fundamental error, and (2) the court abused its discretion by denying his motion to suppress evidence seized from his home. For the following reasons, we affirm.

## BACKGROUND[1]

¶2        Acting on a tip that Espy's home might be a drug "stash house," Detectives Wheeler and Mendez staked out the property. Before long, a black SUV arrived at the house and the driver got out of the car and carried something inside. At that point, because they knew there was someone in the house, the detectives decided to attempt to make contact by conducting a "knock and talk."

¶3        After donning police vests and requesting backup units to monitor the perimeter of the property, the detectives approached the house through a small courtyard next to the front door. As they entered the courtyard, they noticed that the home's exterior screen door was closed, but the interior door was ajar. The officers detected a strong odor of marijuana wafting through the screen door.

¶4        Hearing voices inside, the detectives knocked and Espy appeared at the front door. After the detectives identified themselves as law enforcement officials, they asked Espy to join them outside. Instead of stepping outside, however, Espy closed the interior door and locked the deadbolt.

¶5        Undeterred, the detectives continued knocking at the screen door and announced they would not leave until everyone in the house came

<hr />

[1]      We view the facts in the light most favorable to sustaining the verdict. *State v. Payne*, 233 Ariz. 484, 509, ¶ 93 (2013).

outside. Another man, holding a young child, then opened the interior door. The detectives told the man they were "investigating the odor of marijuana," and asked that everyone inside the house come outside. Notwithstanding the detectives' requests, no one came out of the house. Instead, the second man shut the interior door. Detective Mendez explained through the closed door that they were going to get a search warrant and would not be leaving the property.

¶6 Awhile after the officers first knocked on the door of the house, Espy opened the front door and said that the people inside would come out if the officers could ensure that "nobody inside the house would be charged with anything." Espy advised Detective Wheeler that he was responsible for the house and that the other people inside had no "responsibility over this house," indicating to Officer Wheeler that anything found inside was his and that he alone would bear any associated responsibility. Espy, accompanied by three young children, another man, and a woman, then emerged from the house.

¶7 After Espy was outside, Detective Wheeler advised him of his *Miranda* rights, and Espy repeatedly told the detective that neither the other man in the house nor the woman, who was Espy's fiancée, were "involved." Espy also repeated that he did not want the others to be arrested or to go to jail. Meanwhile, other officers conducted a protective sweep of the house to ensure that no one else was inside. When the officers finished their sweep, they informed Detective Wheeler that several bales of marijuana were located inside one of the bedrooms.

¶8 Armed with this information, Detective Wheeler asked Espy how much marijuana was inside his home, and Espy responded "[100], maybe, 200 pounds." Espy also admitted that the marijuana had been delivered three days earlier by somebody in an SUV. Later that evening, officers obtained a warrant and searched the home, finding: (1) numerous small stashes of marijuana throughout the house; (2) a ledger that recorded the weights of the marijuana bales; (3) a large scale; and (4) 11 bales of marijuana, weighing 273 pounds altogether.

¶9 The State charged Espy with one count of possession of marijuana for sale. The State also alleged an aggravating factor.

¶10 At trial, a detective testified that marijuana sold in bulk quantity—such as that found in Espy's home—has a value of approximately $450 per pound, and therefore the seized drugs were worth more than $100,000. Given this street value, and the quantity seized from

the home, the detective opined that Espy possessed the marijuana bales for sale rather than personal use.

¶11 Taking the stand in his own defense, Espy explained that a few weeks before the police searched his home, he rented out his spare bedroom to a friend's nephew. Claiming he never noticed an odor of marijuana emanating from his tenant's bedroom, Espy explained he frequently used marijuana himself, as demonstrated by the small stashes located throughout the house. Nonetheless, Espy admitted that before the police searched his home, he thought "something [was] wrong" because there were "big blocks" covered with plastic bags in the spare bedroom. Espy assumed the tenant was storing "something illegal" in the room but he did nothing to confirm his suspicions. He admitted he had gone into the spare bedroom the previous week and saw blankets covering a large quantity of what "could have been hay" or "something worse."

¶12 Espy also testified that the morning of the day the police staked out his home, an acquaintance informed him the bags in his tenant's bedroom contained marijuana. When asked about his statement to detectives that he alone was responsible for whatever was found inside his home, Espy stated that he simply took responsibility for renting the spare bedroom, did not want his fiancée or the other man who was there at the time to be charged, and denied that he meant to imply he owned or possessed the marijuana bales. Likewise, Espy acknowledged that he told detectives at least 100 pounds of marijuana was in his home, but claimed he simply "completed the equation" after officers told him how many bales they found and the average weight of a bale.

¶13 After a five-day trial, a jury convicted Espy as charged. The superior court sentenced Espy to a term of four years' imprisonment.

## DISCUSSION

### I.  Admission of Plea Negotiation Statements

¶14 Espy argues the superior court improperly permitted the State to impeach his testimony with a statement he made during a settlement conference. Because Espy failed to object in the superior court, we review only for fundamental error. *See State v. Henderson*, 210 Ariz. 561, 567 ¶¶ 19-20 (2005).

¶15          The Arizona Supreme Court recently clarified review for fundamental error in *State v. Escalante*, which provides the appropriate step-by-step analysis:

> To summarize, the first step in fundamental error review is determining whether trial error exists. If it does, an appellate court must decide whether the error is fundamental. In doing so, the court should consider the totality of the circumstances. A defendant establishes fundamental error by showing that (1) the error went to the foundation of the case, (2) the error took from the defendant a right essential to his defense, *or* (3) the error was so egregious that he could not possibly have received a fair trial. If the defendant establishes fundamental error under prongs one or two, he must make a separate showing of prejudice, which also "involves a fact-intensive inquiry." If the defendant establishes the third prong, he has shown both fundamental error and prejudice, and a new trial must be granted. The defendant bears the burden of persuasion at each step.

799 Ariz. Adv. Rep. 13, ¶ 21 (Sept. 14, 2018) (citations omitted). Given this clarification, we proceed by first determining whether a trial error occurred.

¶16          On the second day of Espy's cross-examination, the prosecutor notified the court that she intended to use a statement Espy made during a settlement conference to impeach his trial testimony that he had no knowledge of the marijuana bales. Without objection, the prosecutor then asked Espy whether he had admitted, "at a prior hearing," that he knew of the marijuana bales. Espy denied making such a statement, explaining he had suspected "something was wrong in the house" but did not know of the marijuana bales until after his arrest.

¶17          At that point, the jury exited the courtroom and the prosecutor presented Espy, who remained on the stand, with a personal video player and headphones. After the jury returned to the courtroom, the prosecutor again asked Espy whether he had admitted at a "prior court proceeding" that he knew marijuana was in the spare room. Espy testified that he could not recall any specifics regarding the prior hearing, and the prosecutor then "refresh[ed] his recollection" by having him privately listen, using the headphones, to a brief video recording of a portion of the February 2017 settlement conference. After Espy listened to the video, the following exchange took place:

Q. And now remember, Mr. Espy, we're just talking about 4:00 PM on May 12th and not anything else. That is the only question. Is your recollection refreshed?

A. Yes.

Q. Mr. Espy, now that your recollection has been refreshed, isn't it true that on February 27, 2017, you knew it was marijuana?

A. Yes, I testified to that already.

Q. And on February 27, 2017, you stated that around 4:00 PM on May 12th, you knew it was marijuana?

A. Yes, I know.

¶18 Addressing this issue on redirect, defense counsel asked Espy whether, in talking to officers outside his home, he "confess[ed]" that he "knew and maintained possession of 11 bales of marijuana" in his spare bedroom. Denying making such a statement, Espy explained that after the sweep, Detective Wheeler asked him how much a bale weighs, and he responded that he did not know. Then, according to Espy, the detective provided him with a "ballpark figure" of a single bale's weight. Given this information, Espy testified he simply "did the math." Detective Wheeler testified Espy said that there were between 100 to 200 pounds of marijuana in his house. Espy testified he did not admit to the detective that the garbage bags in the room contained marijuana and did not admit he owned the bales. When his counsel then asked, "Because even then, you didn't know what it was. Is that a fair statement," Espy responded: "No. At that time, I had an idea that it was marijuana." To further rebut the State's assertion that Espy had said at a prior court hearing that he knew of the marijuana bales before the protective sweep, defense counsel elicited testimony that Espy had made a statement at a previous court appearance to "resolv[e]" the case, but at no time intended to sell marijuana.

¶19 During closing argument, the prosecutor told the jurors that Espy "had to admit" his knowledge of the marijuana at "the prior court hearing." Contrasting this prior admission with Espy's denials at trial, the prosecutor remarked, "He can't keep the story straight."

¶20 Pursuant to Arizona Rule of Evidence ("Rule") 410, statements made by a defendant during plea discussions are inadmissible. *See also* Ariz. R. Crim. P. 17.4(f) ("Arizona Rule of Evidence 410 governs the

admissibility of a plea, a plea discussion, and any related statement."). Unlike some other prophylactic rules governing the admissibility of defendants' statements, Rule 410 forecloses the use of plea negotiations for both substantive and impeachment purposes. *State v. Vargas*, 127 Ariz. 59, 61 (1980). Like its federal counterpart, the rule "is designed to promote candor" and encourage defendants "to enter into plea agreements by assuring them [that] statements made while negotiating an agreement . . . cannot be used . . . in the event no agreement is reached or the agreement is rejected by the court or withdrawn." *State v. Campoy*, 220 Ariz. 539, 547-48, ¶ 24 (App. 2009). Indeed, as explained by our supreme court, "[t]o permit the use of plea discussions for impeachment would have a strong chilling effect on plea negotiations." *Vargas*, 127 Ariz. at 61.

**¶21** As the State concedes, the superior court erred in violation of Rule 410 by permitting the prosecutor to impeach Espy's testimony with the statement he made at a settlement conference. Proceeding with our review under *Escalante*, the next step is to determine whether that trial error was fundamental by considering the totality of the circumstances. 799 Ariz. Adv. Rep. 13, ¶ 21.

**¶22** The State concedes that the prosecutor's improper use of the statement from the settlement conference "arguably denied Espy a fair trial and arguably took away a right essential to his defense" because his entire defense—namely, that he did not *know* marijuana bales were concealed in his spare room before the day he was arrested—hinged upon his credibility. However, the State also contends the statement from the settlement conference constituted only a minor exchange over the course of the five-day trial.

**¶23** Contrary to the State's assertion, the prosecutor's use during cross-examination of the statement Espy made at the settlement conference was not "minor." Instead, the record reflects that the prosecutor's questions regarding this issue were of substantial duration and pertained directly to Espy's defense—that he had no prior knowledge of the large quantities of marijuana found in his spare bedroom.

**¶24** Likewise, notwithstanding the State's contention, the prosecutor did not "mitigate" the "damage" by referring to the settlement conference as a "prior hearing" or by having Espy refresh his recollection of his statement by watching a video of the settlement conference with headphones. The harm was in the jury knowing that he had made the admission, not that he made the admission during a settlement conference. After Espy viewed the video, the prosecutor's follow-up questions

expressly referenced what Espy had said during plea negotiation, thereby presenting that evidence to the jury.

¶25 We conclude the prosecutor's improper use of Espy's statement from the settlement conference was a fundamental error that went to the foundation of his case in accordance with the first prong outlined by *Escalante. See* 799 Ariz. Adv. Rep. 13, ¶ 18 (an error goes to the foundation of a case when it "directly impacts a key factual dispute"). Whether Espy knew of the large quantity of marijuana in the extra bedroom was the key factual dispute in his case, and the error was compounded when the prosecutor referred to Espy's prior statement during closing arguments.

¶26 Because we conclude the error was fundamental under the first prong of the *Escalante* analysis, we must next determine whether Espy has made "a separate showing of prejudice" arising from the error. *Id.* at ¶ 21. A defendant establishes prejudice from fundamental error when he demonstrates that, "without the error, a reasonable jury could have reached a different result, even if substantial evidence of guilt exists." *Id.* at ¶ 34. In light of the other uncontroverted evidence presented at trial, Espy has failed to demonstrate the requisite prejudice. As recounted above, before exiting his home, Espy told detectives that no one else present was "involved," no one else should be "charged with anything," and that everything in the home was his. Significantly, by his own admission, days before the police visited his home, Espy suspected that illegal contraband was stored inside his spare bedroom, and even by his account, he learned for sure earlier that same day that the bags contained marijuana.

¶27 Given the undisputed evidence that he had suspected for days that there was illegal contraband in the spare bedroom, Espy has failed to show that without the fundamentally erroneous admission of his statement from the plea negotiation, "a reasonable jury could have plausibly and intelligently returned a different verdict." *Id.* at ¶ 31.

## II.     Denial of Motion to Suppress

¶28 Espy contends the superior court improperly denied his motion to suppress the evidence seized from his home. Specifically, he argues the protective sweep that precipitated the search of his residence was illegal because no specific facts substantiated the need for a protective sweep and law enforcement officers had no actual concern for their safety.

In addition, he asserts the protective sweep was a pretext for a warrantless search for evidence.[2]

**¶29**     Before trial, Espy moved to suppress all evidence seized from his home. At an evidentiary hearing held on the motion, Detective Wheeler testified that he and Detective Mendez surveilled Espy's house after receiving a tip that "bulk marijuana" had been delivered to the residence. After the detectives initially contacted Espy and he shut and locked his interior door, other officers monitoring the perimeter of the property reported that "metal shutters . . . started going down," covering all the property's windows. Given these circumstances, Detective Wheeler was unable to determine how many people were inside.  After Espy and the five other individuals came out of the home, he therefore remained concerned that someone may have stayed behind to "protect [the] drugs." Accordingly, the detective ordered a "quick safety check" to ensure that no dangerous individuals remained inside.

**¶30**     After considering the evidence presented, the superior court denied the motion to suppress, finding: (1) the officers were unable to determine how many people were in the home because the occupants shut the interior door and shuttered the windows after the detectives first contacted Espy, (2) the occupants did not comply with the order to vacate the property for a period of time, and (3) the detectives knew multiple people were inside the residence. Based on these "articulable factors," as well as Detective Wheeler's experience investigating drug "stash houses," the court concluded the detective reasonably believed a dangerous individual may have remained inside the home, posing a potential threat to the officers' safety, and therefore the protective sweep was lawful.

**¶31**     We review the denial of a motion to suppress for an abuse of discretion, considering only the evidence presented at the suppression hearing and viewing those facts in the light most favorable to sustaining the

---

[2]     In his opening brief, Espy also argues the protective sweep was unlawful because it was not incident to an arrest. He did not raise this claim in the superior court, however, and abandoned the argument in his reply brief. Therefore, we do not consider it. *See State v. Foshay*, 239 Ariz. 271, 273, ¶ 5 n.2 (App. 2016) (declining to consider an argument that the appellant "abandoned" in his reply brief); *State v. Lefevre*, 193 Ariz. 385, 389, ¶ 15 (App. 1998) ("Normally, failure to raise a claim at trial waives appellate review of that claim, even if the alleged error is of constitutional dimension.").

superior court's decision. *State v. Mendoza-Ruiz*, 225 Ariz. 473, 474, ¶ 2 n.1 (App. 2010). We review de novo, however, the superior court's ultimate legal conclusion that a search and seizure "complied with the dictates of the Fourth Amendment." *State v. Valle*, 196 Ariz. 324, 326, ¶ 6 (App. 2000). In conducting our review, we defer to the superior court's determination of witnesses' credibility, *Mendoza-Ruiz*, 225 Ariz. at 475, ¶ 6, and uphold the court's ruling if it is legally correct for any reason. *State v. Huez*, 240 Ariz. 406, 412, ¶ 19 (App. 2016).

**¶32** The federal and state constitutions protect individuals against unreasonable searches and seizures, U.S. Const. amend. IV.; Ariz. Const. art. 2, § 8, and "any evidence collected in violation" of these provisions "is generally inadmissible in a subsequent criminal trial." *State v. Valenzuela*, 239 Ariz. 299, 302, ¶ 10 (2016). "A warrantless search is per se unreasonable . . . unless an exception to the warrant requirement applies." *State v. Peoples*, 240 Ariz. 244, 247, ¶ 9 (2016).

**¶33** One such exception is the protective sweep, first recognized by the United States Supreme Court in *Maryland v. Buie*, 494 U.S. 325 (1990). *State v. Fisher*, 226 Ariz. 563, 565, ¶ 8 (2011). In *Buie*, the Supreme Court held that law enforcement officers may conduct two types of protective sweeps "incident to [an] arrest." 494 U.S. at 334. First, "as a precautionary matter and without probable cause or reasonable suspicion," officers may "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* Second, when "articulable facts" support a reasonable belief "that the area to be swept harbors an individual posing a danger to those on the arrest scene," officers may conduct a broader sweep of the premises. *Id.* Thus, under *Buie*, a protective sweep of an entire house is lawful only when police officers have a reasonable belief, predicated on articulable facts, that the home harbors "an individual posing a danger." *Id.* As such, mere speculation or ignorance is insufficient to justify the privacy intrusion, and under the *Buie* framework, the State bears the burden of proof to show that officers had an articulable concern for their safety. *Fisher*, 226 Ariz. at 566-67, ¶¶ 13, 15 ("Officers cannot conduct protective sweeps based on mere speculation or the general risk inherent in all police work.").

**¶34** At the evidentiary hearing, Detective Wheeler explained why he feared that someone remained inside Espy's house. First, the detective had received a tip suggesting that Espy's home was a drug "stash house." In the detective's personal experience with drug investigations, stash houses are usually occupied by multiple people who are armed with guns to protect the drugs they are housing. Second, after detecting a strong odor

of marijuana wafting from Espy's house, which substantiated the tip, the detective contacted Espy through a partially open door, and Espy responded by closing and locking the door. Immediately thereafter, officers monitoring the perimeter of the property observed metal shutters closing at each window, and a man briefly exited the home and then reentered. Third, despite the detectives' persistent knocking, a significant amount of time elapsed between his initial contact with Espy and the occupants' eventual compliance with his order to vacate the property. On this record, specific "articulable facts" supported the detective's reasonable belief that Espy's home could harbor a dangerous individual. Therefore, the superior court did not err by finding the protective sweep was justified.

¶35　　　　Espy also contends the protective sweep was unlawful because the State failed to prove, under a subjective standard, that the officers were "actually concerned." Stated differently, Espy asserts the officers did not exhibit sufficient fear and anxiety to support the sweep. Contrary to Espy's contentions, however, the governing case law does not require that officers manifest fear or worry before conducting a protective sweep. Rather, the Fourth Amendment applies an objective standard of review to officer conduct, and a protective sweep is lawful if the officers had the requisite legal justification. *See Brigham City v. Stuart*, 547 U.S. 398, 404 (2006) ("An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action.'") (citation omitted). Moreover, unlike the circumstances in *Buie*, 494 U.S. at 337-38 (Stevens, J., concurring) (noting officer expressly testified that "he was not worried about any possible danger" before conducting a protective sweep), in this case, Detective Wheeler did not deny that he had safety concerns before the sweep. Instead, he repeatedly testified that he believed the sweep was necessary to ensure the officers' safety. Therefore, the record supports the superior court's finding that the detective reasonably believed a protective sweep was imperative to protect against hidden dangers.

¶36　　　　Next, Espy argues the protective sweep was in fact an illegal search for evidence. As support for this claim, Espy cites: (1) photographs demonstrating police officers (a) broke through the locked spare bedroom door and (b) "ripped open plastic bags," and (2) Detective Wheeler's testimony that officers found marijuana while conducting the protective sweep.

¶37　　　　At the evidentiary hearing, Detective Wheeler unambiguously testified that the photographs of opened plastic bags containing marijuana bales were taken after the police officers obtained a

search warrant. He also explained that the officers who conducted the protective sweep searched only in locations "where a person could hide," and did not look for evidence of criminal wrongdoing. In response, defense counsel presented no controverting evidence. Although it is undisputed that the officers broke through the locked spare bedroom door as part of the protective sweep, there is no reasonable dispute that a person could hide in a locked bedroom. Finally, the record reflects that once the officers broke through the locked spare bedroom door, they found several large black trash bags in plain view. Given the overwhelming odor of marijuana, the bags' shape, and the laundry detergent sprinkled all over the spare room's floor, which is typically used as an attempt to mask the distinct odor of marijuana, the officers reasonably concluded that the bags contained marijuana. Therefore, Espy has failed to show that the officers conducted an illegal search, and the superior court did not err by denying Espy's motion to suppress.[3]

**CONCLUSION**

¶38        For the foregoing reasons, we affirm the conviction and sentence.



AMY M. WOOD • Clerk of the Court
FILED:  AA

---

[3]        Citing *State v. Ferrier*, 136 Wash. 2d 103 (1998), Espy invites the court to "adopt a prophylactic rule" requiring law enforcement officers to advise homeowners that they may refuse consent to a search of their property. We decline Espy's invitation. *See State ex rel. Romley v. Gaines*, 205 Ariz. 138, 144, ¶ 19 (App. 2003) (noting public policy issues are "firmly in the province of the legislature," not the court of appeals). The record does not reflect that Espy consented to a search of his home.