NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

---

STATE OF ARIZONA, *Appellee,*

*v.*

JULIE PEREZ, *Appellant.*

No. 1 CA-CR 20-0047
FILED 5-18-2021

---

Appeal from the Superior Court in Maricopa County
No. CR2018-0145466-002
The Honorable Julie A. LaFave, Judge *Pro Tempore*

**AFFIRMED**

---

COUNSEL

Arizona Attorney General's Office, Phoenix
By Eric Knobloch
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Jesse Finn Turner
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Judge Cynthia J. Bailey delivered the decision of the Court, in which Presiding Judge Paul J. McMurdie and Judge Lawrence F. Winthrop joined.

---

**B A I L E Y**, Judge:

¶1        Julie Perez appeals her convictions and sentences for possession of dangerous drugs (methamphetamine) and possession of drug paraphernalia.  For the following reasons, we affirm.

## FACTS[1] AND PROCEDURAL HISTORY

¶2        While patrolling an area near a casino around 2:00 a.m., Scottsdale Police Officer Maki saw a car traveling with only one working headlight.  Maki followed the car, observed it weaving within its lane, then initiated a traffic stop.  At the stop, Maki approached the car and spoke with its two occupants: Christine Peters, the driver, and Perez, the front-seat passenger.  Maki acquired their driver's licenses, along with the car's registration and insurance information.  The car was registered to Peters' son.  In conducting a record check from his patrol car, Maki learned that both Peters and Perez had prior convictions, some of which were for drug-related offenses.

¶3        Following the record check, Maki asked Peters if he could search the car.  Peters declined, explaining the car belonged to her son.  She permitted Maki to search her purse, however, and he found no contraband inside.  Meanwhile, Officer English arrived at the scene to conduct a driving-under-the-influence ("DUI") investigation, based on Maki's observations of Peters' driving behavior and her bloodshot, watery eyes.

---

[1] Because the superior court's denials of two suppression motions are the only issues raised on appeal, "[w]e restrict our review to consideration of the facts the trial court heard at the suppression hearing[s]," *State v. Blackmore*, 186 Ariz. 630, 631 (1996), viewing the evidence in the light most favorable to upholding the court's suppression orders, *State v. Weakland*, 246 Ariz. 67, 69, ¶ 5 (2019).

Peters agreed to perform field sobriety tests, and English ultimately concluded that Peters was not impaired.

¶4        Once English had completed the DUI investigation, Maki informed Peters that the officers had determined she was not impaired but further told her that he still suspected that "something else is going on here tonight." Maki asked Peters if she was aware of anything in the car that he "should be concerned about." She replied that her son smokes marijuana and that she was not sure what he kept in the car. Maki soon told Peters he believed there might be a pipe or marijuana inside the car, then continued, "I'm not going to take you to jail. It's not worth my time. It's not worth your time. But I do want you to be honest with me about it." Peters responded that there might be a marijuana pipe in the car.

¶5        After approximately three minutes had passed in this exchange, Peters invited Maki to search her backpack, retrieved it from the car, and handed it to Maki. Maki's search revealed three pipes commonly used to smoke methamphetamine and a scale coated with apparent methamphetamine residue. Having discovered the contraband, the officers conducted a warrantless search of the car and its contents, including Perez's purse. In Perez's purse, the officers found methamphetamine and a pipe.

¶6        A grand jury indicted Perez on one count each of possession of dangerous drugs (methamphetamine) and possession of drug paraphernalia. The grand jurors charged Peters in the same indictment with possession of methamphetamine for sale and possession of drug paraphernalia.[2]

¶7        Before trial, codefendant Peters moved to suppress all evidence seized during the traffic stop, asserting that Maki had improperly coerced her consent to search the backpack and that the illegal backpack search required suppression of the evidence gathered in the subsequent car search as "fruit of the poisonous tree." In denying Peters' suppression motion, the superior court found that, based on its review of video from Maki's body-worn camera ("BWC"),[3] the State had established that Peters "volunteer[ed]" her backpack through a "validly obtained consent."

---

[2] Peters eventually entered a plea agreement with the State resolving the charges before trial.

[3] The BWC video was the only evidence the superior court considered at the hearing. No witnesses testified.

¶8            Perez never sought to join her codefendant's motion, nor did she otherwise challenge the constitutionality of the backpack search before the superior court. Instead, citing *Rodriguez v. United States*, 575 U.S. 348 (2015), Perez separately moved to suppress the drug evidence seized from the car, arguing Maki impermissibly prolonged the detention. The court held an evidentiary hearing on Perez's motion at which Maki testified, and the State introduced into evidence both Maki's BWC video and a copy of his police report.

¶9            At the suppression hearing, Maki explained why he suspected Peters and Perez were engaging in criminal activity. Maki testified that the first "red flag" he noticed was the area in which they were traveling:

> I've dealt with individuals coming from and going to the [casino], which is east of that location. . . . There's a high, high concentrated drug area where there's a lot of drug transactions, a lot of drug dealers, as well as drug users who will frequently go to the casino to either pick up or to sell different types of various drugs.

¶10          Another factor drawing Maki's suspicion was "the criminal history for both subjects, [because] both indicated drug[-]related history." He also observed that their behavior was "odd" and "very nervous." Maki additionally cited the "time of night, being that it was roughly 2:00 in the morning. There's very few cars on the road, this is a time of night that we also experience a lot of other criminal activities." Maki further noted "the fact that . . . [they had] driven past other gambling facilities to go to this facility . . . [when] they lived on the other side of the valley."

¶11          Finally, Maki described that "their relationship was kind of unclear of how they actually know each other . . . [and] was a little odd." Maki explained that such a relationship suggested drug-related activity because in his "prior contact with individuals that might be in the area either to commit various criminal related activities or . . . partake in drug use together, they don't necessarily know each other that well . . . they know very little about each other."

¶12          The superior court found Maki's testimony credible and denied Perez's motion. In so doing, the court concluded that extending the detention was reasonable because Maki "has the criminal history, he has the information, and he starts asking questions that go hand in hand with

4

the reasons he articulated to continue the stop." The court further explained its decision as follows:

> The initial reasons, headlight, I think that's a decision that he could have made. And before he testified that's why I said, don't tell me he was just waiting around to decide whether or not to do the headlight and, in the interim, do all these things. Well, it turns out he didn't. That's a decision he hadn't made yet. But, in the interim, he allocated all of those other bases to believe there's something afoot here, given the location, the criminal activities, experience in the past, combined with the criminal history and what he gains from the driver, Ms. Peters.

¶13 A jury found Perez guilty as charged. The superior court sentenced Perez as a category-three repetitive offender to concurrent terms of imprisonment for each conviction, the length of which was six years. We have jurisdiction over Perez's timely appeal pursuant to Article 6, Section 9, of the Arizona Constitution and Arizona Revised Statutes ("A.R.S.") §§ 12-120.21(A)(1), 13-4031, and -4033(A)(1).

## DISCUSSION

¶14 On appeal, Perez challenges the superior court's denials of the two suppression motions. *Supra* ¶¶ 7-8. The Fourth Amendment to the United States Constitution protects individuals against unreasonable searches and seizures, and evidence seized in violation of its protection is generally excluded from a criminal trial.[4] *State v. Peoples*, 240 Ariz. 244, 247, ¶¶ 8-9 (2016). "We review for abuse of discretion the trial court's factual findings on [a] motion to suppress, but review de novo the trial court's ultimate legal determination that the search complied with the Fourth Amendment." *State v. Gilstrap*, 235 Ariz. 296, 297, ¶ 6 (2014).

---

[4] Because Perez neither cites the Arizona Constitution nor presents separate argument based on it, we analyze the issue only under the federal constitution. *State v. Dean*, 206 Ariz. 158, 161, ¶ 8 n.1 (2003); *see State v. Juarez*, 203 Ariz. 441, 444, ¶ 14 (App. 2002) ("[E]xcept in cases involving 'unlawful' warrantless home entries, Arizona courts have not yet applied Article 2, Section 8 to grant broader protections against search and seizure than those available under the federal constitution."); *see also State v. Sanchez*, 200 Ariz. 163, 166, ¶ 8 (App. 2001) (waiving issue because defendant failed to develop argument on appeal).

I.   Perez lacks standing to challenge the constitutionality of the backpack search.

¶15     For the first time on appeal, Perez argues that Peters' consent to search the backpack was involuntary, thereby invalidating the subsequent car search and rendering inadmissible the evidence seized. Because Perez did not raise this issue before the superior court, we apply fundamental-error review. *See State v. Newell*, 212 Ariz. 389, 398, ¶ 34 (2006) (reviewing for fundamental error a suppression argument first raised on appeal); *see also State v. Marahrens*, 114 Ariz. 304, 305-06 (1977) (waiving suppression issue when defendant neither joined codefendant's motion nor raised the issue at trial). To show fundamental error, a defendant carries the burden to demonstrate (1) the superior court committed error, (2) the error was fundamental under the circumstances of the case, and (3) resulting prejudice. *State v. Escalante*, 245 Ariz. 135, 142, ¶ 21 (2018).

¶16     "Fourth Amendment rights . . . may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978) (quotation omitted). Consequently, "[i]t has long been the rule that a defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that *his* Fourth Amendment rights were violated by the challenged search or seizure." *United States v. Padilla*, 508 U.S. 77, 81 (1993).

¶17     Although "[o]ur courts have sometimes referred to this requirement as 'standing' for the sake of brevity," the inquiry turns on "whether a defendant possessed a legitimate expectation of privacy applying Fourth Amendment principles rather than traditional standing principles." *Peoples*, 240 Ariz. at 247, ¶ 8 (citations omitted). "To have a *legitimate* expectation of privacy protected by the Fourth Amendment, a person must show both 'an actual (subjective) expectation of privacy' and that the expectation is one that society is prepared to recognize as 'justifiable' under the circumstances." *State v. Allen*, 216 Ariz. 320, 323, ¶ 13 (App. 2007) (citing *Smith v. Maryland*, 442 U.S. 735, 740 (1979)).

¶18     Applying these principles here, Perez does not argue, much less demonstrate, that she maintained *any* expectation of privacy in Peters' backpack. To the contrary, the uncontested evidence shows that the backpack belonged exclusively to Peters and that Perez never asserted a privacy or property interest in it. *See State v. Tarkington*, 218 Ariz. 369, 370, ¶ 7 (App. 2008) ("In order to challenge a search, a person must first show he had a legitimate expectation of privacy in the area searched."). Accordingly, Perez has not met her burden to establish standing to

challenge the backpack search as unconstitutional. *See Rakas*, 439 U.S. at 134 ("A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by the search of a third person's premises or property has not had any of his Fourth Amendment rights infringed.").

¶19 Nevertheless, for the first time in her reply brief, Perez[5] cites *United States v. Perez*, 689 F.2d 1336 (9th Cir. 1982), to argue she "should be able to challenge misconduct which directly led to the search" because her purse was in the car and searched. Her reliance on *Perez* is misplaced. In *Perez*, several codefendants had hired "a man named Sanchez"[6] to transport heroin for them, using his truck. *Id.* at 1337. The codefendants hid four pounds of heroin in the truck's gas tank, and one defendant traveled as a passenger in Sanchez's truck while the other codefendants followed closely in another vehicle to conduct surveillance. *Id.* Customs officers asked Sanchez if they could search his truck, and Sanchez consented to a search of the truck. *Id.* A narcotics dog alerted to the gas tank, and officers found four pounds of heroin in the subsequent search. *Id.*

¶20 The Ninth Circuit held that the codefendants had a legitimate expectation of privacy in Sanchez's truck because (1) the codefendants had made a "formalized arrangement" with Sanchez to transport the heroin and (2) the codefendants "kept the truck under close surveillance" for approximately 160 miles to ensure "no one interfered with the carrying out of their plan and the delivery of their property." *Id.* at 1338. *Perez* thus supports the proposition that a defendant "may have a legitimate expectation of privacy in a place or object he does not own" only if the defendant first shows a formal arrangement indicating joint control and supervision over the place searched or item seized. *Id.*; *see, e.g., United States v. Taketa*, 923 F.2d 665, 671 (9th Cir. 1991).

¶21 Unlike in *Perez*, no evidence in this case indicates, nor does Appellant assert, that the codefendants had entered a formal arrangement of joint control and supervision related to Peters' backpack. And Appellant points to no evidence that she "took reasonable precautions to maintain [a] privacy interest" in the backpack, as the defendants in *Perez* did. *Perez*, 689

___

[5] We refer to Perez as Appellant in ¶¶ 19-21 to avoid confusion with the defendant of the same surname in the Ninth Circuit case.

[6] The opinion does not provide Sanchez's full name, also stating that he died before trial.

F.2d at 1338. Therefore, Appellant's argument based on *Perez* is without merit.

¶22 Moreover, even if we were to conclude that Perez has the requisite standing, other circumstances support the superior court's finding that Peters' consent was voluntary. *See State v. Valenzuela*, 239 Ariz. 299, 301-03, ¶¶ 1, 11 (2016) (explaining that "[a]lthough the Fourth Amendment generally prohibits warrantless searches, they are permitted if there is free and voluntary consent to search," which "[t]he [S]tate must prove by a preponderance of the evidence"). Voluntariness is a factual question determined from the totality of circumstances involved. *State v. Butler*, 232 Ariz. 84, 88, ¶ 19 (2013); *see also Valenzuela*, 239 Ariz. at 302, ¶ 11.

¶23 Consistent with the superior court's ruling, the BWC video shows Peters expressly offered her backpack to Maki, and did so absent any question, instruction, or prompt from the officer. *See State v. Sweeney*, 224 Ariz. 107, 111, ¶ 12 (App. 2010) (explaining appellate court may independently review video evidence). That she immediately retrieved the backpack from the car and handed it to Maki further bolsters the superior court's conclusion. *See, e.g., State v. Hernandez*, 244 Ariz. 1, 5, ¶ 17 (2018) (noting conduct may communicate consent). That Peters granted consent for the backpack search while steadfastly refusing to permit the car search also supports the court's conclusion. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973) (considering the knowledge of the right to refuse consent as one factor in determining voluntariness).

¶24 Furthermore, Peters never withdrew or limited her consent. *See State v. Becerra*, 239 Ariz. 90, 92, ¶ 9 (App. 2016) ("Even after a person initially consents to a search, she nevertheless remains free to withdraw or narrow the scope" of consent). She was not handcuffed, nor had the officers drawn their weapons. *See State v. Laughter*, 128 Ariz. 264, 266-67 (App. 1980). And there is no evidence showing the officers used threats or force to gain her consent. *Id.* at 266.

¶25 Perez counters that Maki coerced Peters' consent by telling her he would not take her to jail, asserting the comment constituted an impermissible promise of leniency. But Maki's comment was made while the two discussed whether the car contained her son's marijuana or his pipe. Perez thus fails to show that Maki's statement improperly induced Peters' consent, given that Maki never mentioned the backpack and learned of its existence only when Peters disclosed it.

**¶26** To the extent the isolated comment suggests possible coercion, it did not alone compel the superior court to conclude that Peters' will had been overcome, given the context and the totality of the circumstances. *Schneckloth*, 412 U.S. at 225-26 (describing the test for voluntariness as whether "defendant's will was overborne"). Therefore, assuming *arguendo* Perez has standing to assert her challenge, the superior court did not err in denying Peters' suppression motion.

II. Maki had developed reasonable suspicion to justify extending the detention.

**¶27** Perez next argues the superior court erred in denying her suppression motion. Specifically, she asserts that "everything after Officer English completed his investigation was an illegal detention under *Rodriguez*" because the State failed to establish additional reasonable suspicion. We note that she does not challenge the propriety of the initial traffic stop, nor does she contend the delay from the DUI investigation was unconstitutional. Furthermore, she concedes "the car was searched via a proper application of the automobile exception and incident to arrest."

**¶28** "[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop," and "[a]uthority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). At that point, "the driver must be permitted to proceed on his way without further delay or questioning" unless: (1) the encounter becomes consensual, or (2) during the encounter, the officer develops "a reasonable and articulable suspicion that the driver is engaged in illegal activity." *State v. Teagle*, 217 Ariz. 17, 23, ¶ 22 (App. 2007). If the police unjustifiably prolong a detention, even if the intrusion is *de minimis*, the seizure violates the Fourth Amendment. *Rodriguez*, 575 U.S. at 354-56.

**¶29** Reasonable suspicion requires "some minimal, objective justification for an investigatory detention," a standard that is "something short of probable cause" but more than a mere hunch. *Teagle*, 217 Ariz. at 23-24, ¶ 25 (quotations omitted). In assessing whether reasonable suspicion exists, courts examine all relevant factors collectively, even when each in isolation may have an innocent explanation. *Id.* A trained and experienced officer may be "able to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer." *Brown v. Texas*, 443 U.S. 47, 52 n.2 (1979); *see Teagle*, 217 Ariz. at 24, ¶ 26 (deferring to an officer's ability to distinguish between innocent and suspicious actions).

"[A] suspect's criminal history is part of the 'totality of the circumstances' that informs an officer's reasonable suspicion of criminal activity." *State v. Woods*, 236 Ariz. 527, 530, ¶ 12 (App. 2015).

¶30            As a threshold matter, we find unpersuasive the State's contention that "this case is not a *Rodriguez* extension" because, when Peters consented to the backpack search, Maki had not yet decided whether to issue a warning for the headlight violation. The record shows the officers had detained the codefendants for approximately twenty-two minutes before Peters granted consent. In that amount of time, Maki reasonably should have decided whether to issue a warning for such a traffic violation. *See Rodriguez*, 575 U.S. at 354. Because the State does not argue the encounter became consensual, and Maki extended the detention to question Peters on matters unrelated to the traffic violation, we must determine whether he had reasonable suspicion to do so.

¶31            Here, Maki articulated several objective reasons for suspecting that Peters and Perez may have been involved in transporting illegal drugs: (1) they had recently visited a casino located in a high-drug-crime area at a time when such criminal activity is prevalent; (2) they had traveled a significant distance from where they lived, passing other casinos on their way; (3) their criminal histories, which included drug-related crimes; (4) their nervous behavior; and (5) their unclear relationship, which, by Maki's account, resembled a trait he had observed among groups of drug users in the area.

¶32            Although each reason alone may have an innocent explanation, we do not "parse out each individual factor, categorize it as potentially innocent, and reject it." *State v. O'Meara*, 198 Ariz. 294, 296, ¶ 10 (2000). Instead, "[t]here is a gestalt to the totality of the circumstances test." *Id.* Considered in the aggregate and properly deferring to the officer's training and experience, it was reasonable for Maki to infer from the cited factors that the codefendants were involved in criminal activity.

¶33            Perez nonetheless relies on *Sweeney* to argue that Maki failed to demonstrate reasonable suspicion because the "factors [he identified] would not serve to eliminate a substantial portion of innocent travelers." We find *Sweeney* to be distinguishable. In *Sweeney*, at a traffic stop, an officer initially gave the defendant a warning, informed him he was free to go, and "wished him a safe trip" before engaging him in further, consensual conversation. 224 Ariz. at 109, 113, ¶¶ 3-5. The officer soon requested consent to search the car and to conduct a dog sniff. *Id.* at 109-10, ¶ 5. The defendant declined both requests and attempted to leave. *Id.* at ¶¶ 5-6. At

that point, the officer grabbed the defendant, detained him, and ordered him to stand in front of the patrol car until another officer arrived. *Id.* at 110, ¶ 6. The police eventually searched the vehicle and discovered cocaine. *Id.*

¶34 On appeal, this court concluded that the second seizure was unlawful because it was ultimately triggered by the defendant's refusal to consent, reasoning "the invocation of one's constitutional rights cannot constitute a circumstance that gives rise to reasonable suspicion." *Id.* at 115, ¶ 32. The record does not reflect, and Perez does not assert, that such circumstances are present here. Accordingly, because Maki had developed reasonable independent suspicion that the codefendants were committing drug-related crimes, we detect no error in the superior court's ruling.

## CONCLUSION

¶35 For the foregoing reasons, we affirm the superior court's denials of the suppression motions and Perez's convictions and sentences.

